IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Winston-Salem Division

JUDY CARIAS, as Administratrix of the )
Estate of Didier Josue Carias, )
                                      )
        Plaintiff, )
                                      )
    v. )                                  Civil Action No. 1:24-cv-765 (RDA/JLW)
                                      )
NORTH CAROLINA DEPARTMENT )
OF PUBLIC SAFETY, *et al.*, )
                                      )
        Defendants. )
_____)

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Lorraine Maclean O'Conor, M.D.'s ("Dr. O'Conor") Motion to Dismiss Plaintiff's 42 U.S.C. § 1983 claim against her (Dkt. 20) ("Dr. O'Conor Motion") and on Defendants North Carolina Department of Public Safety ("DPS"), Sean D. Douthit ("Officer Douthit"), Martha Turner, Psy.M.A., and Henry Brandhorst, Psy.D.'s ("DPS *et al.*") Motion to Dismiss the Complaint (Dkt. 23) ("DPS *et al.* Motion"). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7.3(c)(1). This matter has been fully briefed. Accordingly, the matter is now ripe for disposition. Having considered the Motions together with the Complaint (Dkt. 1), Defendants' Memoranda in Support (Dkts. 21, 24), Plaintiff's Oppositions (Dkts. 27, 28), and Defendants' Replies (Dkts. 31, 32), this Court DENIES the Dr. O'Conor Motion and GRANTS-IN-PART and DENIES-IN-PART the DPS *et al.* Motion for the reasons that follow.

1

# I. BACKGROUND

## A. Factual Background[1]

### *Carias's Psychiatric History and Incarceration at Lee County Jail*

Since at least 2015, Didier Josue Carias ("Decedent" or "Carias") had an extensive history of mental health diagnoses related to circumstances both outside and inside DPS facilities, including diagnoses for schizophrenia and borderline personality disorder. Dkt. 1 ¶ 16. Carias had multiple psychiatric hospitalizations in the years leading up to his incarceration at Piedmont Correctional Institution ("Piedmont"). *Id.* ¶ 17. Carias also had a history of self-injury while in DPS facilities and at least two suicide attempts. *Id.* ¶ 18. For example, at one point, Lee County Jail staff involuntarily committed Carias to the local hospital due to his mental health issues. *Id.* ¶ 19. While at the hospital, Carias reported he believed he was hearing voices and then hit a hospital security guard, ultimately leading to his probation supervision being revoked on the underlying charge that had originally led to his incarceration. *Id.* During this same time period, Carias reported suicidal ideation and indicated that he had last attempted to harm himself the week before by cutting his wrists. *Id.* ¶ 20. He was transferred to the inpatient psychiatric unit at Central Prison on suicide precautions and was not returned to Lee County Jail until February 28, 2022. *Id.*

While at the Lee County Jail, Carias also had a history of repeated, unprovoked altercations with correctional officers or others because he reported that voices in his head told him to do so. *Id.* ¶ 21. Mental health providers repeatedly questioned whether his medications were effective. *Id.* On May 25, 2022, Carias had a meeting with mental health providers due to a reported crisis.

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within Plaintiff's Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

*Id.* ¶ 22. He reported that he was still "hearing voices that nobody cares about me," and "auditory hallucinations that are leading to aggressive interactions with others." *Id.* On August 15, 2022, during a psychiatric follow-up appointment, Carias reported that he was "still hearing a lot of voices and stuff . . . tell me what to do, and not to do . . . they tell me to kill myself . . . bad stuff about myself." *Id.* ¶ 23. That provider recommended a "medication consult to review antipsychotic efficacy," noting that Carias "continues to complain of command auditory hallucinations, sometimes self-destructive." *Id.*

On August 23, 2022, a Judgement and Commitment Upon Revocation of Probation ("Judgment") was entered which revoked Carias's probation and ordered his confinement. Notably, the Judgment further ordered: "WILLFUL VIOLATION/PROBATION REVOKED/ACTIVATE SUSP SENT/COURT RECOMMENDS DEF BE HOUSE AT MENTAL HEALTH FACILITY/SENT TO RUN CONCURRENT WITH ANY OTHER SENT/DEF TO RECEIVE MENTAL HEALTH TREATMENT WHILE INCARCERATED." *Id.* ¶ 24.

### Carias's Arrival at Piedmont and Initial Mental Health Assessment

Carias was transferred from Lee County Jail to Piedmont on August 25, 2022. *Id.* ¶ 25. Upon arrival in processing, Carias immediately assaulted another inmate without provocation, punching him in the face more than once. *Id.* Carias reported that he assaulted the other inmate because he heard voices in his head telling him to do so and that the other inmate had it out for him. *Id.* ¶ 26. Following this altercation, Carias was taken to a registered nurse, who performed a "Restrictive Housing Screening encounter" in order to have Carias placed in restrictive housing, also known as solitary confinement. *Id.* ¶ 27. In her comments on her assessment of Carias, the nurse noted that Carias had a history of more than three inpatient mental health treatments and that

3

his last suicide attempt was 7-12 months earlier. *Id.* ¶ 28. She then described Carias as a "[c]utter-attempted suicide by cutting wrist," and noted "[h]earing voices that told him to attack offender in B-Area." *Id.* The nurse was so concerned by Carias's behavior that her note also read: "[P]lease contact Lee County jail for MAR [medication-assisted recovery]. Offender reports being on MH meds. Hearing voices. NEED MEDS ASAP!" *Id.* ¶ 29. The nurse further stated that she was "[r]equesting records from Lee County Jail and from Behavioral Health in Sanford, NC" and "[a]dvised M. Turner with mental health of offender's actions and statements." *Id.* ¶ 30. A referral was made to mental health services for Carias that same day he arrived at Piedmont. *Id.* ¶ 31. Following his assessment by the nurse, Carias was taken to restrictive housing. *Id.* ¶ 32. Carias was not placed on any form of close or continuous monitoring on August 25, 2022. *Id.* ¶ 33.

### *Initial Mental Health Assessment and Failure to Require Continuous Monitoring*

Defendant Turner met with Carias at Piedmont on August 25, 2022, at approximately 16:30. *Id.* ¶ 34. She identified him as presenting with "schizophrenia and [a] history of assaultive behavior," and acknowledged that he "was incarcerated from 2016-2018 and was a Safekeeper at Central Prison twice." *Id.* Turner recorded Carias's mental health history, noting that his first "contact" was at age 15 when he was diagnosed with depression and ADHD. *Id.* ¶ 35. Carias reported to Turner that, for the "last four years[,] he has been experiencing audio hallucinations," and "feeling paranoid and feel[ing] he had the powers of telepathy." *Id.* ¶ 36. Turner wrote down Carias's self-reported history of "10 psychiatric hospitalizations during the last few years but none longer than a month." *Id.* Turner indicated that Carias had been diagnosed with Schizophrenia, ADHD, and Unspecified Personality Disorder with Borderline Traits during his prior incarcerations, and that he reported being on a number of psychiatric medications, including presently taking Zyprexa and Depakote. *Id.* ¶ 37. Turner further recorded Carias's report of: (i) "a

4

couple of suicide attempts (overdose and cutting his wrist)"; (ii) "a history of cutting"; (iii) that he "has been unstable, violent, and acting out since arriving at this facility"; and (iv) that he was hearing voices. *Id.* ¶ 38. Nothing in Turner's notes indicated she followed up with Carias about what the voices in his head told him in connection with the altercation that day. *Id.* ¶ 39.

According to Turner in her initial assessment, psychiatric "[d]iagnoses of Schizophrenia (paranoid type), ADHD by history, and Borderline Personality Disorder appear supported at this time." *Id.* ¶ 40. Yet Turner also indicated that Carias's issues may not be psychotic in nature but behavioral; specifically, she noted that, due to Carias's "numerous assaultive behaviors, diagnoses of Intermittent Explosive Disorder and/or Unspecified Disruptive, Impulse-Control and Conduct Disorder may be considered." *Id.* ¶ 41. Plaintiff alleges that Turner's considerations in this regard were incorrect and were contrary to Carias's long-standing diagnoses from other DPS mental health professionals. *Id.* Turner further mischaracterized some of Carias's prior behavior as his using threats of harm to self or others "to manipulate change in his environment." *Id.* ¶ 42. Carias also rated his own level of distress that day as 10 on a scale of 0 to 10, indicating maximum distress. *Id.* ¶ 43.

Despite Carias's diagnoses, lengthy psychiatric history, his actions, and his reported auditory hallucinations and distress, Turner only scheduled Carias to see mental health "every 30-45 days for psychotherapy." *Id.* ¶ 44. Moreover, Turner approved Carias's assignment to restrictive housing (also known as solitary confinement) and his placement at an unoccupied side of the restrictive housing floor, where Plaintiff alleges, upon information and belief, that he was farther away from the offices and presence of correctional officers, inhibiting their ability to closely monitor him. *Id.* ¶ 45.

5

Plaintiff alleges, upon information and belief, that DPS staff are trained that the warning signs for suicidal behavior in an offender include: "[h]aving a history of self-injury"; "[h]aving a history of being sent to a psychiatric hospital or inpatient unit at CP or NCCIW"; and "[p]lacement on Restrictive Housing or other single cell control status." *Id.* ¶ 46. Plaintiff alleges that Turner failed to conduct a thorough, appropriate suicide assessment of Carias, despite his history of suicide attempts and physical evidence and self-report of a history of self-injury, his multiple inpatient psychiatric hospitalizations and time in the inpatient unit at Central Prison, and his placement in Restrictive Housing at Piedmont. *Id.* ¶ 47. Plaintiff alleges that Turner failed to place Carias on suicide watch or to require correctional officers to continuously monitor Carias, despite his obvious risk and history of self-injury. *Id.* ¶ 48. And Plaintiff alleges that, upon information and belief, Turner did not communicate to anyone that Carias should be closely monitored or that he posed a risk of self-injury. *Id.* ¶ 49.

### *Carias's Ongoing Mental Health Treatment at Piedmont*

Plaintiffs allege, upon information and belief, that, at some point after August 25, 2022, Carias's mental health and psychiatric records from his incarceration at the Lee County Jail were available to Turner, Dr. O'Conor, and other Piedmont employees and agents, including his mental health providers. *Id.* ¶ 50.

On August 26, 2022, Dr. O'Conor saw Carias via an online visit and ordered that he be placed on the same medications that he was previously prescribed when he was discharged from prison, prescribing 500mg of Divalproex (Depakote), melatonin, and Olanzapine Zydis (Zyprexa) to be administered in the pill line only. *Id.* ¶ 51.

Dr. Brandhorst, as the Psychiatric Program Manager for Piedmont Correctional Institution, also met with Carias on August 26, 2022, and recorded that Carias "has an elevated risk of violence

6

due to . . . a history of mental illness." *Id.* ¶ 52. Although Dr. Brandhorst noted Carias's report of two prior suicide attempts and his history of cutting, he opined that there were "no elevated risk factors presently noted" for Carias for self-injury. *Id.* Dr. Brandhorst did not note that Carias's history of recent violence elevated his present risk of self-injury. *Id.* ¶ 53. Dr. Brandhorst did not recommend or instruct that Carias be placed on any form of suicide watch, close monitoring, or continuous monitoring. *Id.* ¶ 54.

Dr. O'Conor saw Carias again on August 30, 2022, via an online appointment. *Id.* ¶ 55. During that visit, Dr. O'Conor noted that Carias did have "an elevated risk of self-injury due to: History of self-injurious behavior." *Id.* ¶ 55. In documenting Carias's history, she observed that he had "been incarcerated twice as a safe keeper," which is reserved for prisoners who pose a risk of violence requiring a higher level of supervision or for prisoners who need medical or mental health treatment. *Id.* ¶ 56. Dr. O'Conor also recorded Carias's psychiatric history, in part, as follows:

> The inmate was hospitalized approximately 10 times in California, Puerto Rico, and North Carolina. He's also been in the inpatient unit at Central prison in 2015, 2017, and 2021. He's usually hospitalized due to auditory hallucinations and suicidal ideations. The inmate states that he has a history of overdosing and cutting. He stated that he last cut his wrist 10 months ago in jail. He has a history of making threats to harm himself in order to manipulate his environment.
>
> In prison[,] the inmate's been diagnosed with schizophrenia, personality disorder with borderline features, ADHD, unspecified movement disorder, unspecified anxiety disorder. He needs been [sic] treated in prison with Zyprexa, Depakote, melatonin, Abilify, Thorazine, Cogentin, Strattera, Vistaril, and Geodon.

*Id.* Dr. O'Conor also recorded that, according to Carias, "the voices tell him that he's a nobody and he's never going to amount to anything. He stated the voices told him that nobody cares about him." *Id.* ¶ 57.

7

Dr. O'Conor indicated that Carias was not on medications in jail at that time and would be restarted on the same medications he was on at the time he was discharged from a DPS facility in February, although she reduced his daily dose of the antipsychotic medication Depakote. *Id.* ¶ 58. Of most significance, Dr. O'Conor opined that, although Carias had been previously diagnosed with schizophrenia, "his behavior appears to be more consistent with intermittent explosive disorder." *Id.* ¶ 59. Plaintiff alleges that, without clear justification and despite Carias's extensive mental health history, Dr. O'Conor also brushed off Carias's complaints of the voices he heard telling him negative and derogatory things about himself as "not psychotic but a function of low self-esteem." *Id.* ¶ 60.

After meeting with Carias on only two brief occasions via online visits, Dr. O'Conor proceeded to assign Carias the new and allegedly incorrect diagnosis of intermittent explosive disorder. *Id.* ¶ 61. Dr. O'Conor made this alleged misdiagnosis in contradiction to his longstanding prior diagnoses, his self-reported history, his auditory hallucinations, his behavior, and the medications he was on when last discharged from prison and which Dr. O'Conor elected to continue. *Id.* Dr. O'Conor further made this alleged misdiagnosis without performing a proper differential psychiatric diagnosis over sufficient time to fully evaluate and assess Carias. *Id.* Dr. O'Conor did not perform a suicide risk assessment of Carias or direct that anyone else perform a suicide risk assessment. *Id.* ¶ 62. Plaintiff alleges, upon information and belief, that Dr. O'Conor did not communicate to anyone that Carias should be closely monitored or that he posed a risk of self-injury. *Id.* ¶ 63. She merely scheduled Carias to return in three months. *Id.* Dr. O'Conor did not direct that Carias be placed on a psychiatric hold or in a higher level of restrictive housing for psychiatric patients, did not direct that Carias be placed on any suicide watch or self-injury protocol, and did not direct that Carias be closely monitored in any respect. *Id.* ¶ 64.

On August 30, 2022, Dr. O'Conor ordered lab results to test, among other things, the presence of valproic acid (Depakote) in Carias's system. *Id.* ¶ 65. Those results were reported on September 10, 2022, and reflected that his Depakote levels were "low" at 16ug/mL, well below the reference range of 50-100 ug/mL. *Id.* Plaintiff alleges, upon information and belief, that this indicates that Carias was most likely not actually taking his prescribed Depakote dose. *Id.* However, Carias's records do not reflect that Dr. O'Conor ever communicated these lab results to Turner or any other mental health professional responsible for Carias's care and treatment. *Id.* ¶ 66. The records also do not reflect that Dr. O'Conor notified any of the correctional officers responsible for administering or monitoring Carias's medications, or that Dr. O'Conor requested any additional monitoring of Carias's medication intake. *Id.*

Turner next saw Carias on September 20, 2022, for a restrictive housing evaluation in order to assess and authorize Carias's continued placement in restrictive housing. *Id.* ¶ 67. Turner reported (contrary to the lab results ordered by Dr. O'Conor) that Carias "has excellent compliance with his medication," but that Carias had requested to discontinue his Depakote prescription. *Id.* ¶ 68. Turner approved Carias's continued placement in restrictive housing. *Id.* ¶ 69.

Following her visit with Carias on September 20, 2022, Turner received an email from Dr. O'Conor. *Id.* ¶ 70. Based on that email, Turner decided to encourage Carias "to remain on Depakote," as the psychiatrist believed Depakote may be more beneficial than his other medication, even though she had previously reduced his daily dose of that medication. *Id.* Turner also noted, after receiving the email from Dr. O'Conor, that "[i]t is felt the diagnosis of Intermittent Explosive Disorder is more applicable than a psychotic diagnosis." *Id.* ¶ 71. Plaintiff alleges, based upon information and belief, that Turner again did not communicate to anyone that Carias should be closely monitored or that he posed a risk of self-injury. *Id.* ¶ 72.

9

*Piedmont Policies*

As of September 2022, Piedmont had a number of policies and procedures addressing the identification of inmates who posed a risk of self-injury and how to respond to those inmates. *Id.* ¶ 73. Piedmont Correctional SOP .0414, Section .0004(g) provides: "All Restrictive Housing and control offenders must be personally observed by custody staff at least every hour on an irregular schedule. [. . .] Offenders who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation consistent with the Adult Facility's Health Care policy, TXIII-7 Self-Injurious Behavior. At Risk Self-Injurious Behavior offenders will be under continuing observation consistent with the Adult Facility's Health Care." *Id.* ¶ 74. As of September 26, 2022, custody staff including Defendant Officer Douthit were aware that Carias was in restrictive housing and was also mentally disordered. *Id.* ¶ 75. According to Piedmont's own procedures, Plaintiff alleges Carias should have been observed more frequently than at least once every hour, and in fact should have been under continuing observation. *Id.*

Piedmont Correctional SOP .0906, Section .0002 provides that: "Correctional staff has the responsibility to identify self-injurious behavior (SIB), ensure the safe placement and management of an offender who exhibits SIB, and promptly notify the Officer-in-Charge (OIC)." *Id.* ¶ 76. According to Piedmont Correctional SOP .0906, Section .0004(b): "An offender who is suspected of being at risk for self-injury by correctional staff shall be placed on SIB Precautions with constant observation until the offender can be seen and evaluated by the psychiatric provider, psychologist, or clinical social worker. The offender shall be placed in either one of two identified SIB cells (the one in Restrictive Housing should be used first and if occupied, the SIB room in the Infirmary is to be used) by a correctional officer who shall initiate self-injury precautions. The OIC is to be notified immediately of the event." *Id.* ¶ 77. Plaintiff alleges that, despite the obvious signs,

10

symptoms, and risk factors of self-injury, at no point while Carias was incarcerated at Piedmont did any correctional staff place Carias on SIB Precautions, implement constant observation, or place Carias in one of two identified SIB cells, in violation of Piedmont's own policies. *Id.* ¶ 78.

Piedmont Correctional SOP .0906, Section .004(b) continues by providing that an offender on SIB Precautions is given only "a safety smock, safety blanket, and vinyl covered mattress" in their cell, while "[a]ll other materials are to be removed unless authorized by the behavioral health clinician." *Id.* ¶ 79. Section.004(b) requires the removal of bed sheets from any cell in which the offender is placed on SIB Precautions. *Id.* ¶ 80. Plaintiff alleges that, despite the obvious signs, symptoms, and risk factors of self-injury, at no point while Carias was incarcerated at Piedmont did any correctional staff remove materials from his cell – including the bed sheet –as called for in Piedmont's own policies. *Id.* ¶ 81.

In addition, once placed on Self-Injurious Behavior ("SIB") precautions, under Piedmont Correctional SOP .0906, Section .0004(d) an "offender will be monitored by continuous line-of-sight observation by a correctional officer who has no other duties beyond offender observation." *Id.* ¶ 82. Again, Plaintiff alleges that, despite the obvious signs, symptoms, and risk factors of self-injury, at no point while Carias was incarcerated at Piedmont did any correctional officer monitor Carias by continuous line-of-sight observation, in violation of Piedmont's own policies. *Id.* ¶ 83.

Piedmont Correctional SOP .0906, Section .0002 also provides that: "Psychology Program Managers/Designees are responsible for ensuring that processes for the identification, management and appropriate referral of offenders at risk for self-injurious behaviors are implemented; and provide for ongoing education/training for employees on issues pertinent to the safe and effective management of offenders at-risk for self-injurious behavior." *Id.* ¶ 84. Dr. Brandhorst, as the Psychology Program Manager for Piedmont, allegedly failed to ensure that

11

Piedmont's own processes and policies for the identification, management, and appropriate referral for inmates like Carias who were at risk for self-injurious behaviors were actually implemented, and that both mental health providers and correctional staff received proper education and training in safely and effectively managing inmates at risk for self-injurious behavior and suicide. *Id.* ¶ 85.

### *Carias's Death*

On September 26, 2022, at approximately 13:19, Officer Douthit passed by Carias's cell for laundry exchange and knocked on the cell door. *Id.* ¶ 86. When there was no response, Officer Douthit opened the food passage door on the cell door to look in and saw Carias standing on top of his in-cell toilet. *Id.* Officer Douthit asked if Carias wanted to exchange clothes but again got no response. *Id.* Officer Douthit then locked the food passage door and went on. *Id.*

Officer Douthit did not open Carias's cell for a better view to determine what Carias was doing or what his status was. *Id.* ¶ 87. Officer Douthit did not enter Carias's cell, did not attempt to engage Carias in further conversation, did not call for assistance from any other officer, did not ensure Carias's safe placement, did not notify the Officer-in-Charge, and in fact did nothing at all but continue on with laundry exchange. *Id.* Although Officer Douthit states that he informed another officer that he saw Carias's feet standing atop the toilet, Plaintiff alleges that there is no documentation of this purported communication or indication that Officer Douthit raised any sort of alarm that resulted in any other person visiting Carias's cell. *Id.* ¶ 88.

At approximately 14:23 on September 26, 2022, two other correctional officers were performing rounds when they came to Carias's cell. *Id.* ¶ 89. After also receiving no verbal response from Carias, they looked through the food passage door on the cell door and saw Carias on top of the toilet, not moving. *Id.* Those officers entered Carias's cell to find him hanging by his bedsheet from an overhead sprinkler. *Id.* The officers immediately called a Code Blue and cut

12

Carias down to begin chest compressions. *Id.* ¶ 90. Unfortunately for Carias, it was too late. *Id.* Carias was pronounced dead by paramedics at 14:49. *Id.* ¶ 91.

At no point during his stay at Piedmont was Carias placed on any type of suicide watch or close monitoring or continuous monitoring. *Id.* ¶ 92. As of September 26, 2022, Carias had been in restrictive housing during his entire stay at Piedmont of 32 days. *Id.* ¶ 93. Carias was in restrictive housing for 32 consecutive days despite the fact that NC DPS Policy TX-III-9 provides: "If placement in restrictive housing of an inmate with a serious and persistent mental illness is necessary, the placement shall be limited to 30 days or less. *Id.*

Plaintiff alleges, upon information and belief, that following Carias's death Officer Douthit was disciplined for failure to properly report his observations of Carias. *Id.* ¶ 94.

## B. Procedural Background

On September 18, 2024, Plaintiff Judy Carias, Carias's mother and the duly appointed Administratrix of the Estate of Didier Josue Carias, brought this action in her representative capacity. *Id.* ¶¶ 1-2. The Complaint alleges the following claims: (1) violation of 42 U.S.C. § 1983 (all Defendants); (2) negligence/gross negligence (DPS, Officer Douthit, and Dr. Brandhorst); (3) negligent hiring, negligent supervision, negligent retention, and gross negligence (DPS); (4) medical negligence/gross negligence (Turner, Dr. O'Conor, and Dr. Brandhorst); (5) premises liability (DPS); (6) wrongful death (all Defendants); (7) North Carolina constitutional violations (DPS, Officer Douthit, and Dr. Brandhorst); (8) punitive damages (Officer Douthit). *Id.* ¶¶ 95-162.

In October 2024, this District Judge was designated to sit on cases within the Middle District of North Carolina. Dkt. 30. In January 2025, this District Judge was assigned this case pursuant to the designation. *Id.*

On December 5, 2024, Dr. O'Conor filed her Motion to Dismiss Plaintiff's 42 U.S.C. § 1983 claim (Count I). Dkt. 21. Dr. O'Conor argues that (1) Plaintiff's Section 1983 claim against Defendant O'Conor fails because Plaintiff does not allege all required elements of a valid claim for deliberate indifference of a serious medical need; and (2) qualified immunity blocks Plaintiff's Section 1983 claim against Dr. O'Conor. *Id.*

On December 16, 2024, DPS *et al.* filed their Motion to Dismiss the Complaint. Dkt. 23. These Defendants argue that (1) the Industrial Commission is the sole and exclusive forum for Plaintiff's tort claims; (2) DPS *et al.* are entitled to governmental or public official immunity; (3) Plaintiff failed to effectuate service on DPS and, thus, the Court lacks personal jurisdiction over DPS; (4) the Eleventh Amendment bars claims for money damages against DPS *et al.* in their official capacity; (5) DPS *et al.* have qualified immunity. *Id.*

On January 16, 2025, Plaintiff filed her Opposition to the Dr. O'Conor Motion, Dkt. 27, and, on January 27, 2025, Plaintiff filed her Opposition to the DPS *et al.* Motion, Dkt. 28.

On January 29, 2025, the parties filed a Joint Stipulation of Partial Dismissal Without Prejudice as to all of Plaintiff's claims against DPS. Dkt. 29.

On January 30, 2025, Dr. O'Conor filed her Reply. Dkt. 31. On February 10, 2025, DPS *et al.* filed their Reply. Dkt. 32.

## II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In

reviewing a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). To be sure, "the [C]ourt 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Typically, at the pleading stage "courts are limited to considering the four corners of the complaint and documents attached or incorporated thereto." *Guerrero v. Ollie's Bargain Outlet, Inc.*, 115 F.4th 349, 356 (4th Cir. 2024).

## III. ANALYSIS

The facts alleged here are unfortunate and Plaintiff understandably seeks to hold people responsible for the death of her son. Nonetheless, the Court must review the factual allegations with a neutral eye to determine whether Plaintiff has plausibly stated a claim against each Defendant and whether any Defendant receives immunity which precludes the claims alleged. After reviewing each of Defendants arguments and the allegations in the Complaint, the Court will deny Dr. O'Conor's Motion and will grant in part and deny in part the DPS *et al.* Motion. The parties' arguments are discussed separately below.

A. Plaintiff's Individual Capacity Negligence Claims (Counts 2-4 and 6) Are Not Barred by Sovereign Immunity or the North Carolina Tort Claims Act.

As a preliminary matter, DPS *et al.* argue that Plaintiff's negligence-based claims (Counts 2-6 of the Complaint) are precluded by North Carolina's sovereign immunity doctrine or are otherwise not a cause of action under North Carolina's Tort Claims Act (the "TCA"). Dkt. 24 at 8. The TCA provides a limited waiver of sovereign immunity for negligence claims asserted against state departments, institutions, and agencies, as well as individual employees sued in their

15

official capacity. *See* N.C. Gen. Stat. § 143-291(a). However, the TCA waives this immunity only for claims filed in the North Carolina Industrial Commission ("NCIC"):

> This Article provides the sole and exclusive remedy for any claim that arises as a result of the negligence of any officer, employee, involuntary servant, or agent of the state while acting within the scope of his office, employment, service, agency, or authority, and the North Carolina Industrial Commission is the sole and exclusive forum for hearing any such claims. Any such claims filed in any other forum arising out of or relating to the same subject matter against the officer, employee, involuntary servant, or agent of the State is precluded.

N.C. Gen. Stat. § 143-291(e). Accordingly, Plaintiff could not bring an *official capacity* negligence claim against Officer Douthit, Dr. Brandhorst, Turner, and Dr. O'Conor (collectively the "Individual Defendants"). *Shaw v. Town of Mint Hill*, 2024 WL 2162891, at *8 (W.D.N.C. May 14, 2024) ("North Carolina retains sovereign immunity against official capacity claims brought before all courts besides the Industrial Commission. Thus, Plaintiff cannot [support] an official capacity negligence claim against SBI Defendants before this Court."); *Torres v. Dye*, 2024 WL 5205570, at *13 (W.D.N.C. Dec. 23, 2024) ("North Carolina's Tort Claims Act ("TCA") provides a limited waiver of sovereign immunity for negligence claims asserted against the State and its departments and agencies. However, that limited waiver 'does not extend to [suits] in federal court.' The Plaintiff's negligence claims asserted against the Defendants in their official capacities will, therefore, be dismissed without prejudice." (quoting *Southeastern Public Safety Group, Inc. v. Munn*, 2024 WL 4625079 (4th Cir. Oct. 2024)).

Here, however, Plaintiff brings her claims against the Individual Defendants in their *individual capacity. See, e.g.*, Dkt. 1 ¶ 10 ("As public employees sued in their *individual capacity*, they are not entitled to public official immunity." (emphasis added)); *id.* ¶ 152 ("All Defendants are *jointly and severally liable* to Plaintiff for the wrongful death of Carias." (emphasis added)); *see also Stewart v. North Carolina*, 393 F.3d 484, 491 (4th Cir. 2005) ("Under North Carolina law

16

'[t]he crucial question for determining whether a defendant is sued in an individual or official capacity is the nature of the relief sought, not the nature of the act or omission alleged.'" (quoting *Meyer v. Walls*, 347 N.C. 97, 489 S.E.2d 880, 887 (1997))). While DPS *et al.* argue that the October 2023 enactment of subsection (e) (quoted above) also precludes individual capacity suits outside the NCIC, courts hearing cases after this enactment have not interpreted it to do so. *See Shaw v. Town of Mint Hill*, 2024 WL 2162891, at *8 (W.D.N.C. May 14, 2024) (holding that "Plaintiff may . . . bring before this Court a negligence claim against SBI Defendants in their <u>individual</u> capacities." (emphasis original)); *Torres v. Dye*, 2024 WL 5205570, at *13 (W.D.N.C. Dec. 23, 2024) (addressing only plaintiff's official capacity negligence claims in discussion of the TCA and later dismissing plaintiff's individual capacity claims as barred by public official immunity instead). This Court declines to deviate from this line of cases.

Accordingly, the Court finds that, because Plaintiff's negligence claims are against Individual Defendants in their individual capacity, they are not precluded by North Carolina's sovereign immunity or the TCA, and the DPS *et al.* Motion will be denied as to this ground.

### B. Officer Douthit Has Public Official Immunity.

DPS *et al.* also argue that Officer Douthit is entitled to the defense of governmental or public official immunity as to the negligence claims asserted against him.[2] Dkt. 24 at 8. Under

---

[2] While DPS *et al.* originally also asserted public official immunity on behalf of Dr. Brandhorst and Turner, in their Reply, DPS *et al.* conceded that Dr. Brandhorst and Turner are not public officials, and thus they are not entitled to the defense of public official immunity. Dkt. 32 at 3 ("Defendants concede *Leonard* excludes medical professionals hired by prisons from holding status as public officials."); *see Leonard v. Bell*, 254 N.C. App. 694, 705 (2017) (holding that physicians hired by the Division of Adult Corrections of the Department of Public Safety "to provide health services to inmates in the DAC" hold positions "not created by statute," such that "they are not public officials for purposes of public official immunity"). Accordingly, the DPS *et al.* Motion is denied to the extent it originally attempted to assert public official immunity as to Dr. Brandhorst and Turner, which they now concede does not apply.

North Carolina law, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." *Campbell v. Anderson*, 156 N.C. App. 371, 376 (2003). "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." *Hunter v. Transylvania Cty. Dep't of Soc. Servs.*, 207 N.C. App. 735, 737 (2010); *see Shaw v. Stroud*, 13 F.3d 791, 803 (4th Cir. 1994). A public official acts "with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa*, 312 N.C. 310, 313 (1984); *see Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Grad*, 312 N.C. at 313.

Here, Plaintiff alleges no facts that Officer Douthit was acting outside the scope of his official duties. Moreover, Plaintiff has failed to present sufficient non-conclusory allegations that Officer Douthit acted maliciously or corruptly. Plaintiff alleges that, on the day in question, Officer Douthit, while conducting laundry exchange, knocked on the door, heard nothing, and opened the food trap door. Dkt. 1 ¶ 86. Seeing Carias standing on the toilet, Officer Douthit asked if Carias wanted a clothing exchange. *Id*. With no response from Carias, Douthit moved on to the next laundry exchange. *Id*. ¶ 87. Plaintiff also alleges that Officer Douthit was aware that, in addition to being in restrictive housing, Carias was mentally disordered. Dkt. 1 ¶ 75. Plaintiff's allegation with respect to Officer Douthit's knowledge of Carias' mental health challenges is conclusory, however, and contradicts Plaintiff's other allegations in the Complaint. *Id*. ¶¶ 85, 110 (alleging that officers were not trained with respect to mental health issues). Importantly, Plaintiff does not allege on what basis Officer Douthit came to have knowledge regarding Carias' mental

18

health status, especially given that Carias was placed on restrictive housing—not a particular mental health unit. Regardless of whether Officer Douthit acted reasonably in failing to react to Carias standing on the toilet,[3] Plaintiff has not alleged sufficient facts to plausibly demonstrate that Officer Douthit acted in a manner which he "intend[ed] to be prejudicial or injurious to another." *Grad*, 312 N.C. at 313.

Accordingly, Plaintiff has not sufficiently alleged that Officer Douthit acted maliciously, corruptly, or outside the scope of his official duties. *See Leete v. County of Warren*, 341 N.C. 116, 119 (1995) ("It is well settled that absent evidence to the contrary, it will always be presumed that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law." (internal quotations omitted)); *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("The law cannot demand that officers be mind readers."). Thus, Officer Douthit has public official immunity as to Claims 2 and 6, and the DPS *et al.* Motion will be granted as to this ground.[4]

C. The Eleventh Amendment Does Not Bar Plaintiff's Claims Against Individual Defendants.

DPS *et al.* also assert that the Eleventh Amendment bars Plaintiff's claims against Officer Douthit, Turner, and Dr. Brandhorst. As Plaintiff has only asserted claims against the Individual

---

[3] Defendants cite to a line of cases from outside of this District regarding inmates standing on toilets. *See Njos v. United States*, 2018 WL 3455826 (M.D. Pa. July 18, 2018) (prisoner stood on toilet to clean and talk through vents to other prisoners); *Parks v. O'Shaughnessy*, 2016 U.S. Dist. LEXIS 59353 (M.D. Pa. May 3, 2016) (prisoner stood on toilet to commit lewd act, but claimed he was talking through vents); *United States v. Harris*, 2009 WL 2762157 (W.D. Va. Aug. 27, 2009) (prisoner standing on toilet to commit lewd act).

[4] Plaintiff also notes that "public officers' immunity . . . is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003). As set forth in greater detail below, Officer Douthit did not act with deliberate indifference to Carias's serious medical needs and thus did not violate Carias's clearly established rights.

19

Defendants in their individual capacities, however, the Eleventh Amendment does not impact Plaintiff's claims against the Individual Defendants. *Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018) ("[T]he Eleventh Amendment does not bar 'an award of damages against an official in his personal capacity [that] can be executed only against the official's personal assets.'"). Accordingly, the DPS *et al.* Motion will be denied in this regard.

### D. Only Officer Douthit Has Qualified Immunity.

DPS *et al.* and Dr. O'Conor further claim that the Individual Defendants have qualified immunity for Plaintiff's individual capacity claims because Plaintiff has failed to show that Individual Defendants violated any of Carias's clearly established constitutional rights. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Essentially, courts inquire as to whether "any reasonable official in the defendant's shoes would have understood that he was violating" the law, both objectively and subjectively. *Mays v. Sprinkle*, 992 F.3d 295, 302 n.5 (4th Cir. 2021). For the following reasons, Officer Douthit is entitled to qualified immunity, but Dr. Brandhorst, Turner, and Dr. O'Conor are not.

### 1. Constitutional Violation

Under the Eighth Amendment, prison officials have a duty to protect prisoners from self-destruction or self-injury. *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981). To establish a violation of the Eighth Amendment by prison officials resulting in a prisoner's self-inflicted injury, the prisoner must prove: (1) the prisoner suffered an objectively serious harm presenting a substantial risk to his health or safety; and (2) such harm was caused by the deliberate indifference

to the health or safety of the prisoner by the defendants. *See Farmer v. Brennan*, 511 U.S. 825, 832-34 (1994); *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

a. Objectively Serious Harm

In their Motion, DPS *et al.* concede that Carias suffered an objectively serious harm presenting a substantial risk to his health or safety. *See* Dkt. 24 at 14 ("Plaintiff's allegations paint a picture of serious mental health issues. Under the Eighth Amendment, '[c]ourts treat an inmate's mental health claims just as seriously as any physical health claims.' *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)). Thus, for purposes of this motion, Defendants concede the objective prong."). However, Dr. O'Conor argues that Carias did not suffer an objectively serious harm; thus, the Court will address this prong.

"A condition is objectively serious if it is 'diagnosed by a physician as mandating treatment' or is 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Short v. Hartman*, 87 F.4th 593, 612 (4th Cir. 2023) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)). "A substantial risk of suicide is certainly the type of serious harm that is contemplated by the first prong of the deliberate indifference test." *Id.* (internal quotation marks omitted) (quoting *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001)).

In *Short*, the Fourth Circuit held that allegations that the decedent "had very recently attempted suicide, was undergoing severe withdrawal, and was experiencing feelings of uselessness or sinfulness" were sufficient to "demonstrate a substantial risk of suicide," and thus "satisfy the objective prong of the deliberate indifference test." *Id.*

Like the decedent in *Short*, Carias had somewhat recently attempted suicide. Dkt. 1 ¶ 20 ("On October 8, 2021, Carias reported suicidal ideation and indicated that he had last attempted to

21

harm himself the week before by cutting his wrists. He was transferred to the inpatient psychiatric unit at Central Prison on suicide precautions and was not returned to Lee County Jail until February 28, 2022."); *id.* ¶ 28 (alleging that, on day of arrival at Piedmont, nurse noted Carias's "last suicide attempt was 7-12 months previously" and that Carias was a "[c]utter" who "attempted suicide by cutting wrist" and was "[h]earing voices that told him to attack offender in B-Area"); *see also id.* ¶ 38 ("Turner further recorded Carias' report of 'a couple of suicide attempts (overdose and cutting his wrist)' and 'a history of cutting,' . . . .").

Moreover, Carias had experienced suicidal thoughts, rated his distress a 10 out of 10, and had feelings of uselessness in the six weeks before his death. *Id.* ¶ 23 ("On August 15, 2022, during a psychiatric follow-up appointment, Carias reported that he was 'still hearing a lot of voices and stuff . . . tell me what to do, and not to do . . . they tell me to kill myself . . . bad stuff about myself.'"); *id.* ¶ 43 ("Carias also rated his own overall level of distress that day [August 25, 2022] as 10 on a scale of 0 to 10, indicating maximum distress."); *id.* ¶ 57 ("Dr. O'Conor also recorded [on August 30, 2022] that according to Carias, "the voices tell him that he's a nobody and he's never going to amount to anything. He stated the voices told him that nobody cares about him.").

Plaintiff has also plausibly alleged that Dr. O'Conor reduced Carias's dose of the anti-psychotic drug that Carias had been prescribed and, in any event, lab results revealed that Carias was also likely not taking that medication. *Id.* ¶ 51 ("On August 26, 2022, Dr. O'Conor saw Carias via an online visit and ordered that he be placed on the same medications he received when he was discharged from prison, prescribing 500mg of Divalproex (Depakote), melatonin, and Olanzapine Zydis (Zyprexa) to be administered in the pill line only."); *id.* ¶ 58 ("she reduced his daily dose of the antipsychotic medication Depakote"); *id.* ¶ 65 ("On August 30, 2022, Dr. O'Conor ordered lab

results to test, among other things, the presence of valproic acid (Depakote) in Carias'[s] system. Those results were reported on September 10, 2022 and reflected that his Depakote levels were 'low' at 16 ug/mL, well below the reference range of 50-100 ug/mL. Upon information and belief, this indicates that Carias was most likely not actually taking his prescribed Depakote dose."); *id.* ¶ 70 ("the psychiatrist believed that Depakote may be more beneficial than his other medication"); *but see id.* ¶ 68 ("Turner reported (contrary to the lab results ordered by Dr. O'Conor) that Carias 'has excellent compliance with his medication,' but that [Carias] had requested to discontinue his Depakote prescription.").

Indeed, multiple lay people had recognized the necessity for a doctor's treatment in the weeks leading up to his death. *Id.* ¶ 24 ("On August 23, 2022, a Judgment and Commitment Upon Revocation of Probation ('Judgment') was entered[:]. . . COURT RECOMMENDS DEF BE HOUSE AT MENTAL HEALTH FACILITY/ . . . DEF TO RECEIVE MENTAL HEALTH TREATMENT WHILE INCARCERATED."); *id.* ¶ 29 (alleging, on day of arrival, nurse wrote "please contact Lee County jail for MAR. Offender reports being on MH meds. Hearing voices. NEED MEDS ASAP!"); *see also id.* ¶¶ 25-26 ("Upon arrival in processing, Carias immediately assaulted another inmate without provocation, punching him in the face more than once. Carias reported that he assaulted the other inmate because he heard voices in his head telling him to do so, that the other inmate had it out for him."). And, on August 30, 2022, Dr. O'Conor noted that Carias had "an elevated risk of self-injury due to: History of self-injurious behavior." *Id.* ¶ 55.

Accordingly, the Court finds that Plaintiff has adequately pleaded that Carias suffered an objectively serious harm presenting a substantial risk to his health or safety to satisfy the objective prong.

23

b.  Deliberate Indifference

As the Fourth Circuit confirmed in *Short*, to adequately state a claim for deliberate indifference, a plaintiff must also allege facts showing "that the prison official acted with deliberate indifference to inmate health or safety, meaning that the official 'had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.'"  *Short*, 87 F.4th at 612 (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)).  "Deliberate indifference is a very high standard[,]" generally only satisfied by conduct that shocks the conscience.  *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (internal quotation marks omitted).

In *Short*,[5] the Fourth Circuit recently held that a correctional officer "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction" where the decedent "conveyed all of these facts—her recent suicide attempt [six weeks earlier], her daily drug use and consequent withdrawal, and her feelings of worthlessness," to the officer when being processed, and the officer "completed two health screening forms evaluating [decedent's] mental health."  87 F.4th at 613 (internal quotation marks omitted).  The officer "also knew the excessive risk posed by her action or inaction" based on the prison's policy identifying "suicide risk factors of which officers should be aware."  *Id.* (factors included "previous attempts to commit suicide" and "depression").  And the officer "was not powerless to mitigate this risk—the Prison Policy lays out several steps [the officer] could have taken, including placing [decedent] in a populated cell, removing items such as bedsheets with

---

[5] The Court notes that the parties have also raised the prior, unpublished Fourth Circuit decision, *Hearn v. Lancaster Cnty.*, 566 F. App'x 231 (4th Cir. 2014).  To the extent *Hearn* is in tension with *Short*, *Short* governs.

which [decedent] could hang herself from the cell, and conducting regular checks every ten to fifteen minutes," but "took none of these steps." *Id.*

**Officer Sean Douthit**

Beginning with Officer Douthit, Plaintiff does not sufficiently allege that he knew of Carias's suicidal intent. As explained in more detail *supra*, although Plaintiff alleges generally that Officer Douthit was aware that in addition to being in restrictive housing, Carias was mentally disordered, Dkt. 1 ¶ 75, Plaintiff does not sufficiently allege specific facts as to how Officer Douthit obtained this knowledge and, indeed, Plaintiff specifically alleges that officers were not provided with appropriate mental health awareness training. Thus, the inferences that Plaintiff seeks to draw from the conduct of Officer Douthit are not reasonably apparent. The only allegations that Plaintiff makes that could demonstrate Officer Douthit's subjective knowledge are his observations that (1) Carias was standing on the toilet and (2) failed to answer questions about wanting a linen exchange. "The law cannot demand that officers be mind readers." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Accordingly, Plaintiff has failed to meet the "very high standard" of pleading deliberate indifference as to Officer Douthit, and Officer Douthit is entitled to qualified immunity.

**Dr. Henry Brandhorst, Psy.D.**

At this stage, Plaintiff has, however, sufficiently alleged facts leading to a reasonable inference that Dr. Brandhorst knew of Carias's suicidal intent and recognized the excessive risk posed by his inaction. Plaintiff specifically alleges that Dr. Brandhorst noted that Carias had "an elevated risk of violence due to . . . a history of mental illness," and had two prior suicide attempts and a history of cutting. Dkt. 1 ¶ 52. These facts belie Dr. Brandhorst's recorded conclusion "that there were 'no elevated risk factors presently noted' for Carias for self-injury." *Id.* ¶¶ 52-53.

25

Because Plaintiff has alleged that Dr. Brandhorst is a Doctor of Psychology and the Psychology Program Manager for Piedmont, Plaintiff has also sufficiently alleged facts leading to a reasonable inference that Dr. Brandhorst recognized that his actions—failure to perform a suicide risk assessment or order one be done, or to "recommend or instruct that Carias be placed on any form of suicide watch, close monitoring, or continuous monitoring," Dkt. 1 ¶¶ 54, 135—were inappropriate in light of Carias's risk of suicide. Pursuant to the Fourth Circuit's decision in *Short*, this is sufficient to allege deliberate indifference. 87 F.4th at 613. Accordingly, Plaintiff has sufficiently alleged deliberate indifference as to Dr. Brandhorst.

**Martha Turner, Psy.M.A.**

Plaintiff has also sufficiently alleged facts leading to a reasonable inference that Turner knew of Carias's suicidal intent and recognized the excessive risk posed by her inaction. Plaintiff specifically alleges that Turner knew that Carias had "schizophrenia and history of assaultive behavior," had twice been a "Safekeeper at Central Prison," had "10 psychiatric hospitalizations during the last few years," "reported being on a number of psychiatric medications, including presently taking Zyprexa and Depakote," and reported "'a couple of suicide attempts (overdose and cutting his wrist)' and 'a history of cutting,'" "was hearing voices," and since arriving at Piedmont had "been unstable, violent, and acting out." Dkt. 1 ¶¶ 34-38. "Carias also rated his own overall level of distress [during his first meeting with Turner] as 10 on a scale of 0 to 10, indicating maximum distress." *Id.* ¶ 43. In her initial assessment, Turner stated that "'[d]iagnoses of Schizophrenia (paranoid type), ADHD by history and Borderline Personality Disorder appear supported at this time.'" *Id.* ¶ 40. Collectively, these facts lead to the reasonable inference that Turner knew of Carias's suicidal ideations.

26

Plaintiff further alleges that, "[d]espite Carias'[s] diagnoses, lengthy psychiatric history, and his actions and reported auditory hallucinations and distress, Turner only scheduled Carias to see mental health 'every 30-45 days for psychotherapy.'" *Id.* ¶ 44. "Moreover, Turner approved [and later re-approved] Carias'[s] assignment to restrictive housing (also known as solitary confinement) and his placement at an unoccupied side of the restrictive housing floor, where he was, upon further information and belief, farther away from the offices and presence of correctional officers, inhibiting their ability to closely monitor him." *Id.* ¶¶ 45, 69. Given Turner's Masters in Psychology and his employment at the Piedmont facility, it is also reasonable to infer that Turner recognized the excessive risk posed by his inaction. Thus, Plaintiff has also sufficiently alleged deliberate indifference as to Turner.

**Dr. Lorraine Maclean O'Conor, M.D.**

Finally, Plaintiff has also sufficiently alleged facts leading to a reasonable inference that Dr. O'Conor knew of Carias's suicidal intent and recognized the excessive risk posed by her inaction. Plaintiff specifically alleges that Dr. O'Conor recorded Carias's psychiatric history in her own words, including notes that Carias "was hospitalized approximately 10 times" and otherwise "been in the inpatient unit at Central prison in 2015, 2017, and 2021," that he was "usually hospitalized due to auditory hallucinations and suicidal ideations," and that he "states that he has a history of overdosing and cutting" and "last cut his wrist 10 months ago in jail." *Id.* ¶ 56. Dr. O'Conor also noted that Carias had been "diagnosed with schizophrenia, personality disorder with borderline features, ADHD, unspecified movement disorder, [and] unspecified anxiety disorder," and that he had been prescribed "Zyprexa, Depakote, melatonin, Abilify, Thorazine, Cogentin, Strattera, Vistaril, and Geodon." *Id.* Dr. O'Conor even allegedly observed that Carias had "an elevated risk of self-injury due to: History of self-injurious behavior." *Id.* ¶ 55. And Dr.

27

O'Conor allegedly noted that, according to Carias, "the voices tell him that he's a nobody and he's never going to amount to anything" and that "the voices told him that nobody cares about him," and she described these complaints as a "function of low self-esteem." *Id.* ¶¶ 57, 60. Moreover, Plaintiff alleges that Dr. O'Conor reduced Carias's daily dosage of the drug that Dr. O'Conor believed would be most effective. *Id.* ¶¶ 58, 70. And, Plaintiff alleges that Dr. O'Conor's own lab results showed that Carias's Depakote (his antipsychotic medication) levels were "well below the reference range," reasonably indicating that Dr. O'Conor was aware that Carias was not actually taking his prescribed dose. *Id.* ¶ 65. Thus, as in *Short*, Plaintiff has sufficiently alleged facts leading to a reasonable inference that Dr. O'Conor knew of Carias's suicidal intent.

Plaintiff further alleges that Dr. O'Conor did not perform a suicide risk assessment or order one be done, or direct that Carias be placed on any suicide watch or self-injury protocol. *Id.* ¶ 62. Instead, Dr. O'Conor reduced Carias's daily dose of the antipsychotic medication Depakote. *Id.* ¶ 58. Given Dr. O'Conor's Doctor of Medicine and employment at Piedmont, it is also reasonable to infer that Dr. O'Conor recognized the excessive risk posed by her action and inaction. Thus, Plaintiff has also sufficiently alleged deliberate indifference as to Dr. O'Conor.

### 2. Clearly Established

Turning to the clearly established prong, "because the Eighth Amendment's deliberate-indifference standard requires knowing conduct, an official who was deliberately indifferent could not also believe 'that [their] actions comported with clearly established law.'" *Pfaller v. Amonette*, 55 F.4th 436, 446 (4th Cir. 2022). Accordingly, in these circumstances, the Fourth Circuit has "'effectively collapse[d]' qualified immunity's two inquiries into one." *Id.* (affirming denial of prison physician's motion for summary judgment on qualified immunity). Accordingly, the

Case 1:24-cv-00765-RDA-JLW    Document 33    Filed 08/19/25    Page 28 of 30

clearly established prong is satisfied for Dr. Brandhorst, Turner, and Dr. O'Conor as well, and, unlike Officer Douthit, they are not entitled to qualified immunity.

### E. Plaintiff States a Claim for Deliberate Indifference as to Dr. Brandhorst, Turner, and Dr. O'Conor.

For the same reasons articulated in the preceding section, Plaintiff states a claim for deliberate indifference as to Dr. Brandhorst, Turner, and Dr. O'Conor, but fails to state a claim as to Officer Douthit.

## IV. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the Dr. O'Conor Motion (Dkt. 20) is DENIED; and it is

FURTHER ORDERED that the DPS *et al.* Motion (Dkt. 23) is GRANTED-IN-PART and DENIED-IN-PART—the Motion is granted with respect to all claims against Officer Douthit, and denied with respect to Dr. Brandhorst, Turner, and Dr. O'Conor; and it is

FURTHER ORDERED that all claims by Plaintiff in this action against Officer Douthit are DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that Officer Douthit is TERMINATED as a defendant in this case; and it is

FURTHER ORDERED that, per the parties' Joint Stipulation of Partial Dismissal Without Prejudice as to all claims by Plaintiff in this action against Defendant North Carolina Department of Public Safety (Dkt. 29), all claims by Plaintiff in this action against Defendant North Carolina Department of Public Safety are DISMISSED WITHOUT PREJUDICE; and it is

29

FURTHER ORDERED that Defendant North Carolina Department of Public Safety is TERMINATED as a defendant in this case; and it is

FURTHER ORDERED that, if Plaintiff chooses, Plaintiff may file an Amended Complaint within THIRTY (30) days of the issuance of this Memorandum Opinion and Order.  If Plaintiff chooses not to file an Amended Complaint, Plaintiff is DIRECTED to file a Notice so indicating within THIRTY (30) days of the issuance of this Memorandum Opinion and Order.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
August 19, 2025

Sitting by Designation:

_____/s/_____

Rossie D. Alston, Jr.
United States District Judge