IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Winston-Salem Division

| | | |
|---|---|---|
| JUDY CARIAS<br>*as Administratrix of the Estate of Didier Josue Carias*,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY, *et al.*,<br><br>Defendants. | ) | Civil Action No. 1:24-cv-765 (RDA/JGM) |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendants Henry Brandhorst, Psy.D. ("Dr. Brandhorst") and Martha Turner, Psy.M.A.'s ("Turner") (collectively, the "Moving Defendants") Motion for Reconsideration ("Motion") (Dkt. 37). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Moving Defendants' Memorandum in Support (Dkt. 38) and Plaintiff's Opposition (Dkt. 39), this Court DENIES the Moving Defendants' Motion for Reconsideration (Dkt. 37) for the reasons that follow.[1]

[1] The Court recognizes that the Court may have taken longer to address this matter than the parties would expect. The Court notes, however, that the Eastern District of Virginia – where this District Judge ordinarily sits – has been inundated with hundreds of petitions for writs of habeas corpus, which by statute must be addressed in expeditious fashion. Moreover, the Eastern District of Virginia has seen an overall increase in cases and the Alexandria Division in particular has received more than *three thousand* civil cases for four active District Judges and one Senior District Judge. Nor does the criminal docket slow to take account of this new influx of civil cases and this District Judge has personally presided over eight criminal trials in the last nine months. Accordingly, this Court has addressed this matter as promptly as possible.

## I. BACKGROUND

### A. Factual Background

***Carias's Psychiatric History and Incarceration at Lee County Jail***

Since at least 2015, Didier Josue Carias (the "Decedent" or "Carias") had an extensive history of mental health diagnoses related to circumstances both outside and inside North Carolina Department of Public Safety ("DPS") facilities, including diagnoses for schizophrenia and borderline personality disorder. Dkt. 1 ¶ 16. Carias had multiple psychiatric hospitalizations in the years leading up to his incarceration at Piedmont Correctional Institution ("Piedmont"). *Id.* ¶ 17. Carias also had a history of self-injury while in DPS facilities and at least two suicide attempts. *Id.* ¶ 18. For example, at one point, Lee County Jail staff involuntarily committed Carias to the local hospital due to his mental health issues. *Id.* ¶ 19. While at the hospital, Carias reported he believed he was hearing voices and then hit a hospital security guard, ultimately leading to his probation supervision being revoked on the underlying charge that had originally led to his incarceration. *Id.* During this same time period, Carias reported suicidal ideation and indicated that he had last attempted to harm himself the week before by cutting his wrists. *Id.* ¶ 20. He was transferred to the inpatient psychiatric unit at Central Prison on suicide precautions and was not returned to Lee County Jail until February 28, 2022. *Id.*

While at the Lee County Jail, Carias also had a history of repeated, unprovoked altercations with correctional officers or others because he reported that voices in his head told him to do so. *Id.* ¶ 21. Mental health providers repeatedly questioned whether his medications were effective. *Id.* On May 25, 2022, Carias had a meeting with mental health providers due to a reported crisis. *Id.* ¶ 22. He reported that he was still "hearing voices that nobody cares about me," and "auditory hallucinations that are leading to aggressive interactions with others." *Id.* On August 15, 2022,

during a psychiatric follow-up appointment, Carias reported that he was "still hearing a lot of voices and stuff . . . tell me what to do, and not to do . . . they tell me to kill myself . . . bad stuff about myself." *Id.* ¶ 23. That provider recommended a "medication consult to review antipsychotic efficacy," noting that Carias "continues to complain of command auditory hallucinations, sometimes self-destructive." *Id.*

On August 23, 2022, a Judgement and Commitment Upon Revocation of Probation ("Judgment") was entered which revoked Carias's probation and ordered his confinement. Notably, the Judgment further ordered: "WILLFUL VIOLATION/PROBATION REVOKED/ACTIVATE SUSP SENT/COURT RECOMMENDS DEF BE HOUSE AT MENTAL HEALTH FACILITY/SENT TO RUN CONCURRENT WITH ANY OTHER SENT/DEF TO RECEIVE MENTAL HEALTH TREATMENT WHILE INCARCERATED." *Id.* ¶ 24.

***Carias's Arrival at Piedmont and Initial Mental Health Assessment***

Carias was transferred from Lee County Jail to Piedmont on August 25, 2022. *Id.* ¶ 25. Upon arrival in processing, Carias immediately assaulted another inmate without provocation, punching him in the face more than once. *Id.* Carias reported that he assaulted the other inmate because he heard voices in his head telling him to do so and that the other inmate had it out for him. *Id.* ¶ 26. Following this altercation, Carias was taken to a registered nurse, who performed a "Restrictive Housing Screening encounter" in order to have Carias placed in restrictive housing, also known as solitary confinement. *Id.* ¶ 27. In her comments on her assessment of Carias, the nurse noted that Carias had a history of more than three inpatient mental health treatments and that his last suicide attempt was 7-12 months earlier. *Id.* ¶ 28. She then described Carias as a "[c]utter-attempted suicide by cutting wrist," and noted "[h]earing voices that told him to attack offender in

B-Area." *Id.* The nurse was so concerned by Carias's behavior that her note also read: "[P]lease contact Lee County jail for MAR [medication-assisted recovery]. Offender reports being on MH meds. Hearing voices. NEED MEDS ASAP!" *Id.* ¶ 29. The nurse further stated that she was "[r]equesting records from Lee County Jail and from Behavioral Health in Sanford, NC" and "[a]dvised M. Turner with mental health of offender's actions and statements." *Id.* ¶ 30. A referral was made to mental health services for Carias that same day he arrived at Piedmont. *Id.* ¶ 31. Following his assessment by the nurse, Carias was taken to restrictive housing. *Id.* ¶ 32. Carias was not placed on any form of close or continuous monitoring on August 25, 2022. *Id.* ¶ 33.

***Initial Mental Health Assessment and Failure to Require Continuous Monitoring***

Defendant Turner met with Carias at Piedmont on August 25, 2022, at approximately 16:30. *Id.* ¶ 34. She identified him as presenting with "schizophrenia and [a] history of assaultive behavior," and acknowledged that he "was incarcerated from 2016-2018 and was a Safekeeper at Central Prison twice." *Id.* Turner recorded Carias's mental health history, noting that his first "contact" was at age 15 when he was diagnosed with depression and ADHD. *Id.* ¶ 35. Carias reported to Turner that, for the "last four years[,] he has been experiencing audio hallucinations," and "feeling paranoid and feel[ing] he had the powers of telepathy." *Id.* ¶ 36. Turner wrote down Carias's self-reported history of "10 psychiatric hospitalizations during the last few years but none longer than a month." *Id.* Turner indicated that Carias had been diagnosed with Schizophrenia, ADHD, and Unspecified Personality Disorder with Borderline Traits during his prior incarcerations, and that he reported being on a number of psychiatric medications, including presently taking Zyprexa and Depakote. *Id.* ¶ 37. Turner further recorded Carias's report of: (i) "a couple of suicide attempts (overdose and cutting his wrist)"; (ii) "a history of cutting"; (iii) that he "has been unstable, violent, and acting out since arriving at this facility"; and (iv) that he was

hearing voices. *Id.* ¶ 38. Nothing in Turner's notes indicated she followed up with Carias about what the voices in his head told him in connection with the altercation that day. *Id.* ¶ 39.

According to Turner in her initial assessment, psychiatric "[d]iagnoses of Schizophrenia (paranoid type), ADHD by history, and Borderline Personality Disorder appear supported at this time." *Id.* ¶ 40. Yet Turner also indicated that Carias's issues may not be psychotic in nature but behavioral; specifically, she noted that, due to Carias's "numerous assaultive behaviors, diagnoses of Intermittent Explosive Disorder and/or Unspecified Disruptive, Impulse-Control and Conduct Disorder may be considered." *Id.* ¶ 41. Plaintiff alleges that Turner's considerations in this regard were incorrect and were contrary to Carias's long-standing diagnoses from other DPS mental health professionals. *Id.* Turner further mischaracterized some of Carias's prior behavior as his using threats of harm to self or others "to manipulate change in his environment." *Id.* ¶ 42. Carias also rated his own level of distress that day as 10 on a scale of 0 to 10, indicating maximum distress. *Id.* ¶ 43.

Despite Carias's diagnoses, lengthy psychiatric history, his actions, and his reported auditory hallucinations and distress, Turner only scheduled Carias to see mental health "every 30-45 days for psychotherapy." *Id.* ¶ 44. Moreover, Turner approved Carias's assignment to restrictive housing (also known as solitary confinement) and his placement at an unoccupied side of the restrictive housing floor, where Plaintiff alleges, upon information and belief, that he was farther away from the offices and presence of correctional officers, inhibiting their ability to closely monitor him. *Id.* ¶ 45.

Plaintiff alleges, upon information and belief, that DPS staff are trained that the warning signs for suicidal behavior in an offender include: "[h]aving a history of self-injury"; "[h]aving a history of being sent to a psychiatric hospital or inpatient unit at CP or NCCIW"; and "[p]lacement

on Restrictive Housing or other single cell control status." *Id.* ¶ 46. Plaintiff alleges that Turner failed to conduct a thorough, appropriate suicide assessment of Carias, despite his history of suicide attempts and physical evidence and self-report of a history of self-injury, his multiple inpatient psychiatric hospitalizations and time in the inpatient unit at Central Prison, and his placement in Restrictive Housing at Piedmont. *Id.* ¶ 47. Plaintiff alleges that Turner failed to place Carias on suicide watch or to require correctional officers to continuously monitor Carias, despite his obvious risk and history of self-injury. *Id.* ¶ 48. And Plaintiff alleges that, upon information and belief, Turner did not communicate to anyone that Carias should be closely monitored or that he posed a risk of self-injury. *Id.* ¶ 49.

***Carias's Ongoing Mental Health Treatment at Piedmont***

Plaintiff alleges, upon information and belief, that, at some point after August 25, 2022, Carias's mental health and psychiatric records from his incarceration at the Lee County Jail were available to Turner, Defendant Lorraine Maclean O'Conor, M.D. ("Dr. O'Conor"), and other Piedmont employees and agents, including his mental health providers. *Id.* ¶ 50.

On August 26, 2022, Dr. O'Conor saw Carias via an online visit and ordered that he be placed on the same medications that he was previously prescribed when he was discharged from prison, prescribing 500mg of Divalproex (Depakote), melatonin, and Olanzapine Zydis (Zyprexa) to be administered in the pill line only. *Id.* ¶ 51.

Dr. Brandhorst, as the Psychiatric Program Manager for Piedmont Correctional Institution, also met with Carias on August 26, 2022, and recorded that Carias "has an elevated risk of violence due to . . . a history of mental illness." *Id.* ¶ 52. Although Dr. Brandhorst noted Carias's report of two prior suicide attempts and his history of cutting, he opined that there were "no elevated risk factors presently noted" for Carias for self-injury. *Id.* Dr. Brandhorst did not note that Carias's

history of recent violence elevated his present risk of self-injury. *Id.* ¶ 53. Dr. Brandhorst did not recommend or instruct that Carias be placed on any form of suicide watch, close monitoring, or continuous monitoring. *Id.* ¶ 54.

Dr. O'Conor saw Carias again on August 30, 2022, via an online appointment. *Id.* ¶ 55. During that visit, Dr. O'Conor noted that Carias did have "an elevated risk of self-injury due to: History of self-injurious behavior." *Id.* ¶ 55. In documenting Carias's history, she observed that he had "been incarcerated twice as a safe keeper," which is reserved for prisoners who pose a risk of violence requiring a higher level of supervision or for prisoners who need medical or mental health treatment. *Id.* ¶ 56. Dr. O'Conor also recorded Carias's psychiatric history, in part, as follows:

> The inmate was hospitalized approximately 10 times in California, Puerto Rico, and North Carolina. He's also been in the inpatient unit at Central prison in 2015, 2017, and 2021. He's usually hospitalized due to auditory hallucinations and suicidal ideations. The inmate states that he has a history of overdosing and cutting. He stated that he last cut his wrist 10 months ago in jail. He has a history of making threats to harm himself in order to manipulate his environment.
>
> In prison[,] the inmate's been diagnosed with schizophrenia, personality disorder with borderline features, ADHD, unspecified movement disorder, unspecified anxiety disorder. He needs been [sic] treated in prison with Zyprexa, Depakote, melatonin, Abilify, Thorazine, Cogentin, Strattera, Vistaril, and Geodon.

*Id.* Dr. O'Conor also recorded that, according to Carias, "the voices tell him that he's a nobody and he's never going to amount to anything. He stated the voices told him that nobody cares about him." *Id.* ¶ 57.

Dr. O'Conor indicated that Carias was not on medications in jail at that time and would be restarted on the same medications he was on at the time he was discharged from a DPS facility in February, although she reduced his daily dose of the antipsychotic medication Depakote. *Id.* ¶ 58. Of most significance, Dr. O'Conor opined that, although Carias had been previously diagnosed

with schizophrenia, "his behavior appears to be more consistent with intermittent explosive disorder." *Id.* ¶ 59. Plaintiff alleges that, without clear justification and despite Carias's extensive mental health history, Dr. O'Conor also brushed off Carias's complaints of the voices he heard telling him negative and derogatory things about himself as "not psychotic but a function of low self-esteem." *Id.* ¶ 60.

After meeting with Carias on only two brief occasions via online visits, Dr. O'Conor proceeded to assign Carias the new and allegedly incorrect diagnosis of intermittent explosive disorder. *Id.* ¶ 61. Dr. O'Conor made this alleged misdiagnosis in contradiction to his longstanding prior diagnoses, his self-reported history, his auditory hallucinations, his behavior, and the medications he was on when last discharged from prison and which Dr. O'Conor elected to continue. *Id.* Dr. O'Conor further made this alleged misdiagnosis without performing a proper differential psychiatric diagnosis over sufficient time to fully evaluate and assess Carias. *Id.* Dr. O'Conor did not perform a suicide risk assessment of Carias or direct that anyone else perform a suicide risk assessment. *Id.* ¶ 62. Plaintiff alleges, upon information and belief, that Dr. O'Conor did not communicate to anyone that Carias should be closely monitored or that he posed a risk of self-injury. *Id.* ¶ 63. She merely scheduled Carias to return in three months. *Id.* Dr. O'Conor did not direct that Carias be placed on a psychiatric hold or in a higher level of restrictive housing for psychiatric patients, did not direct that Carias be placed on any suicide watch or self-injury protocol, and did not direct that Carias be closely monitored in any respect. *Id.* ¶ 64.

On August 30, 2022, Dr. O'Conor ordered lab results to test, among other things, the presence of valproic acid (Depakote) in Carias's system. *Id.* ¶ 65. Those results were reported on September 10, 2022, and reflected that his Depakote levels were "low" at 16ug/mL, well below the reference range of 50-100 ug/mL. *Id.* Plaintiff alleges, upon information and belief, that this

indicates that Carias was most likely not actually taking his prescribed Depakote dose. *Id.* However, Carias's records do not reflect that Dr. O'Conor ever communicated these lab results to Turner or any other mental health professional responsible for Carias's care and treatment. *Id.* ¶ 66. The records also do not reflect that Dr. O'Conor notified any of the correctional officers responsible for administering or monitoring Carias's medications, or that Dr. O'Conor requested any additional monitoring of Carias's medication intake. *Id.*

Turner next saw Carias on September 20, 2022, for a restrictive housing evaluation in order to assess and authorize Carias's continued placement in restrictive housing. *Id.* ¶ 67. Turner reported (contrary to the lab results ordered by Dr. O'Conor) that Carias "has excellent compliance with his medication," but that Carias had requested to discontinue his Depakote prescription. *Id.* ¶ 68. Turner approved Carias's continued placement in restrictive housing. *Id.* ¶ 69.

Following her visit with Carias on September 20, 2022, Turner received an email from Dr. O'Conor. *Id.* ¶ 70. Based on that email, Turner decided to encourage Carias "to remain on Depakote," as the psychiatrist believed Depakote may be more beneficial than his other medication, even though she had previously reduced his daily dose of that medication. *Id.* Turner also noted, after receiving the email from Dr. O'Conor, that "[i]t is felt the diagnosis of Intermittent Explosive Disorder is more applicable than a psychotic diagnosis." *Id.* ¶ 71. Plaintiff alleges, based upon information and belief, that Turner again did not communicate to anyone that Carias should be closely monitored or that he posed a risk of self-injury. *Id.* ¶ 72.

***Piedmont Policies***

As of September 2022, Piedmont had a number of policies and procedures addressing the identification of inmates who posed a risk of self-injury and how to respond to those inmates. *Id.* ¶ 73. Piedmont Correctional SOP .0414, Section .0004(g) provides: "All Restrictive Housing and

control offenders must be personally observed by custody staff at least every hour on an irregular schedule. [. . .] Offenders who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation consistent with the Adult Facility's Health Care policy, TXIII-7 Self-Injurious Behavior. At Risk Self-Injurious Behavior offenders will be under continuing observation consistent with the Adult Facility's Health Care." *Id.* ¶ 74. As of September 26, 2022, custody staff including Defendant Officer Sean. D. Douthit ("Officer Douthit") were aware that Carias was in restrictive housing and was also mentally disordered. *Id.* ¶ 75. According to Piedmont's own procedures, Plaintiff alleges Carias should have been observed more frequently than at least once every hour, and in fact should have been under continuing observation. *Id.*

Piedmont Correctional SOP .0906, Section .0002 provides that: "Correctional staff has the responsibility to identify self-injurious behavior (SIB), ensure the safe placement and management of an offender who exhibits SIB, and promptly notify the Officer-in-Charge (OIC)." *Id.* ¶ 76. According to Piedmont Correctional SOP .0906, Section .0004(b): "An offender who is suspected of being at risk for self-injury by correctional staff shall be placed on SIB Precautions with constant observation until the offender can be seen and evaluated by the psychiatric provider, psychologist, or clinical social worker. The offender shall be placed in either one of two identified SIB cells (the one in Restrictive Housing should be used first and if occupied, the SIB room in the Infirmary is to be used) by a correctional officer who shall initiate self-injury precautions. The OIC is to be notified immediately of the event." *Id.* ¶ 77. Plaintiff alleges that, despite the obvious signs, symptoms, and risk factors of self-injury, at no point while Carias was incarcerated at Piedmont

did any correctional staff place Carias on SIB Precautions, implement constant observation, or place Carias in one of two identified SIB cells, in violation of Piedmont's own policies. *Id.* ¶ 78.

Piedmont Correctional SOP .0906, Section .004(b) continues by providing that an offender on SIB Precautions is given only "a safety smock, safety blanket, and vinyl covered mattress" in their cell, while "[a]ll other materials are to be removed unless authorized by the behavioral health clinician." *Id.* ¶ 79. Section.004(b) requires the removal of bed sheets from any cell in which the offender is placed on SIB Precautions. *Id.* ¶ 80. Plaintiff alleges that, despite the obvious signs, symptoms, and risk factors of self-injury, at no point while Carias was incarcerated at Piedmont did any correctional staff remove materials from his cell – including the bed sheet –as called for in Piedmont's own policies. *Id.* ¶ 81.

In addition, once placed on Self-Injurious Behavior ("SIB") precautions, under Piedmont Correctional SOP .0906, Section .0004(d) an "offender will be monitored by continuous line-of-sight observation by a correctional officer who has no other duties beyond offender observation." *Id.* ¶ 82. Again, Plaintiff alleges that, despite the obvious signs, symptoms, and risk factors of self-injury, at no point while Carias was incarcerated at Piedmont did any correctional officer monitor Carias by continuous line-of-sight observation, in violation of Piedmont's own policies. *Id.* ¶ 83.

Piedmont Correctional SOP .0906, Section .0002 also provides that: "Psychology Program Managers/Designees are responsible for ensuring that processes for the identification, management and appropriate referral of offenders at risk for self-injurious behaviors are implemented; and provide for ongoing education/training for employees on issues pertinent to the safe and effective management of offenders at-risk for self-injurious behavior." *Id.* ¶ 84. Dr. Brandhorst, as the Psychology Program Manager for Piedmont, allegedly failed to ensure that Piedmont's own processes and policies for the identification, management, and appropriate referral

for inmates like Carias who were at risk for self-injurious behaviors were actually implemented, and that both mental health providers and correctional staff received proper education and training in safely and effectively managing inmates at risk for self-injurious behavior and suicide. *Id.* ¶ 85.

***Carias's Death***

On September 26, 2022, at approximately 13:19, Officer Douthit passed by Carias's cell for laundry exchange and knocked on the cell door. *Id.* ¶ 86. When there was no response, Officer Douthit opened the food passage door on the cell door to look in and saw Carias standing on top of his in-cell toilet. *Id.* Officer Douthit asked if Carias wanted to exchange clothes but again got no response. *Id.* Officer Douthit then locked the food passage door and went on. *Id.*

Officer Douthit did not open Carias's cell for a better view to determine what Carias was doing or what his status was. *Id.* ¶ 87. Officer Douthit did not enter Carias's cell, did not attempt to engage Carias in further conversation, did not call for assistance from any other officer, did not ensure Carias's safe placement, did not notify the Officer-in-Charge, and in fact did nothing at all but continue on with laundry exchange. *Id.* Although Officer Douthit states that he informed another officer that he saw Carias's feet standing atop the toilet, Plaintiff alleges that there is no documentation of this purported communication or indication that Officer Douthit raised any sort of alarm that resulted in any other person visiting Carias's cell. *Id.* ¶ 88.

At approximately 14:23 on September 26, 2022, two other correctional officers were performing rounds when they came to Carias's cell. *Id.* ¶ 89. After also receiving no verbal response from Carias, they looked through the food passage door on the cell door and saw Carias on top of the toilet, not moving. *Id.* Those officers entered Carias's cell to find him hanging by his bedsheet from an overhead sprinkler. *Id.* The officers immediately called a Code Blue and cut

Carias down to begin chest compressions. *Id.* ¶ 90. Unfortunately for Carias, it was too late. *Id.* Carias was pronounced dead by paramedics at 14:49. *Id.* ¶ 91.

At no point during his stay at Piedmont was Carias placed on any type of suicide watch or close monitoring or continuous monitoring. *Id.* ¶ 92. As of September 26, 2022, Carias had been in restrictive housing during his entire stay at Piedmont of 32 days. *Id.* ¶ 93. Carias was in restrictive housing for 32 consecutive days despite the fact that NC DPS Policy TX-III-9 provides: "If placement in restrictive housing of an inmate with a serious and persistent mental illness is necessary, the placement shall be limited to 30 days or less. *Id.*

Plaintiff alleges, upon information and belief, that following Carias's death Officer Douthit was disciplined for failure to properly report his observations of Carias. *Id.* ¶ 94.

B. Procedural Background

On September 18, 2024, Plaintiff Judy Carias, Carias's mother and the duly appointed Administratrix of the Estate of Didier Josue Carias, brought this action in her representative capacity. *Id.* ¶¶ 1-2. The Complaint alleges the following claims: (1) violation of 42 U.S.C. § 1983 (all Defendants); (2) negligence/gross negligence (DPS, Officer Douthit, and Dr. Brandhorst); (3) negligent hiring, negligent supervision, negligent retention, and gross negligence (DPS); (4) medical negligence/gross negligence (Turner, Dr. O'Conor, and Dr. Brandhorst); (5) premises liability (DPS); (6) wrongful death (all Defendants); (7) North Carolina constitutional

violations (DPS, Officer Douthit, and Dr. Brandhorst); (8) punitive damages (Officer Douthit). *Id.* ¶¶ 95-162.

In October 2024, this District Judge was designated to sit on cases within the Middle District of North Carolina. Dkt. 30. In January 2025, this District Judge was assigned this case pursuant to the designation. *Id.*

On August 19, 2025, this Court issued an Order that (i) denied Dr. O'Conor's Motion to Dismiss (Dkt. 20); (ii) granted-in-part and denied-in-part DPS *et al.*'s Motion to Dismiss (Dkt. 23)—granting the Motion as to all claims against Officer Douthit and denying it as to Dr. Brandhorst, Turner, and Dr. O'Conor; (iii) dismissed without prejudice all claims against Officer Douthit and terminated him as a defendant; (iv) pursuant to the parties' Joint Stipulation of Dismissal (Dkt. 29), dismissed without prejudice all claims against DPS and terminated it as a defendant; and (v) permitted Plaintiff to file an amended complaint within thirty days or, alternatively, to file a notice indicating that Plaintiff would not amend. *See* Dkt. 33.

On September 2, 2025, the Moving Defendants filed their Objections to Recommended Opinion and Order. Dkt. 34. On September 8, 2025, this Court issued an Order denying the Moving Defendants' Objections, explaining that the August 19, 2025 Memorandum Opinion and Order was issued by a District Judge, not a Magistrate Judge, and therefore was not subject to objections under Rule 71. Dkt. 35. The Court directed the Moving Defendants to file any motion for reconsideration or similar motion by September 19, 2025. *Id.*

On September 19, 2025, the Moving Defendants filed their Motion for Reconsideration (Dkt. 37) and Memorandum in Support (Dkt. 38). On October 10, 2025, Plaintiff filed her Opposition to Moving Defendants' Motion for Reconsideration. Dkt. 39.

## II. STANDARD OF REVIEW

Motions to reconsider interlocutory orders are governed by Rule 54(b) of the Federal Rules of Civil Procedure. Under Rule 54(b), "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" may be revised at any time before entry of final judgment. Fed. R. Civ. P. 54(b). Rule 54(b) thus affords district courts greater flexibility to reconsider interlocutory decisions than Rules 59(e) and 60(b) afford with respect to final judgments. *See Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) ("Compared to motions to reconsider *final* judgments pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light.").

However, "the discretion afforded by Rule 54(b) 'is not limitless,' and [the Fourth Circuit] 'ha[s] cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case.'" *U.S. Tobacco Coop. Inc. v. Big S. Wholsesale of Va., LLC*, 899 F.3d 236, 256-57 (4th Cir. 2018) (quoting *Carlson*, 856 F.3d at 325). Therefore, "[a]s with motions under Rule 59(e), motions under Rule 54(e) are not properly used to present evidence or argument that was available but not presented prior to the challenged ruling." *Kirby v. Red Bull N. Am., Inc.*, 2021 WL 11878933, at *1 (D.S.C. Feb. 18, 2021); *see also Carlson*, 856 F.3d at 326 (affirming denial of reconsideration where moving party relied on evidence that was available before the challenged ruling); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127-128 (2d ed.1995) for the proposition that motions to alter or amend judgment "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."). "This is because, while Rule 54(b) 'gives a district court discretion to revisit earlier rulings in the same case,' such

discretion is 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *U.S. Tobacco Coop.*, 899 F.3d at 257 (quoting *Off. Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)). "Indeed, a motion for reconsideration is not a tool with which an unsuccessful party may rehash the same arguments and facts previously presented. Such a motion will not be granted based on the loser's misplaced attachment to a properly rejected argument." *Roe v. Tucker*, 2025 WL 848449, at *2 (E.D. Va. Mar. 18, 2025).

"Thus, a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) ("[E]arlier decisions of a court become law of the case and must be followed unless '(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'") (citing *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988)). "Generally, courts look to Rule 59(e)'s standards for guidance[2] and will only reconsider interlocutory rulings under Rule 54(b) when (1) there has been an intervening change in controlling law, (2) new evidence becomes available, or (3) the earlier decision was

[2] Where an order is not final and does not resolve all claims, such as in the case of entry of partial dismissal, reconsideration of the interlocutory order is subject to the court's discretion under Rule 54(b), and not the heightened standards of Rule 59(e) or 60(b). *See Am. Canoe*, 326 F.3d at 514-15 ("Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment."). However, such standards "have evolved as a means of guiding that discretion." *Id.* at 515; *Carlson*, 856 F.3d at 325 ("This standard closely resembles the standard applicable to motions to reconsider final orders pursuant to Rule 59(e)."); *Hatch v. DeMayo*, 2018 WL 6003548, at *1 (M.D.N.C. Nov. 15, 2018) ("[C]ourts in this Circuit have frequently looked to the standards under Rule 59(e) for guidance in considering motions for reconsideration under Rule 54(b).") (collecting cases).

based on a clear error of law or would result in a manifest injustice." *White v. City of Greensboro*, 586 F. Supp. 3d 466, 481 (M.D.N.C. 2022) (citing *Am. Canoe Ass'n*, 326 F. 3d at 515). As motions to reconsider disrupt the efficient administration of justice, they are disfavored and granted sparingly. *Roe*, 2025 WL 848449, at *2; *see, e.g.*, *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir. 1997) (noting reconsideration under Rule 59(e) "is an extraordinary remedy that should be applied sparingly"); *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 474 (M.D.N.C. 2003); *Zellner v. United States*, 2020 WL 5240579, at *2 (E.D. Va. Sept. 2, 2020); *see also* 18B Wright & Miller § 44781. Mere disagreement with a court's ruling does not properly support a motion for reconsideration. *Zellner*, 2020 WL 5240579, at *2 (citing *Hutchinson v. Staton*, 99 F.2d 1076, 1081 (4th Cir. 1993)).

Here, the Moving Defendants do not identify substantially different evidence or an intervening change in controlling law. They instead contend that the Court clearly erred in declining to dismiss Plaintiff's state-law claims under N.C. Gen. Stat. § 143-291(e), and that requiring them to continue litigating those claims would result in manifest injustice. *See* Dkt 38 at 4-7. The Motion therefore rises or falls under Rule 54(b)'s third ground: the clear-error exception. The clear-error exception is narrow. "As [the Fourth Circuit] ha[s] noted on more than one occasion, 'a prior decision does not qualify for the third exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong.'" *U.S. Tobacco*, 899 F.3d at 258 (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)) (alterations omitted); *see also United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 657 n.6 (4th Cir. 2015).

## III. ANALYSIS

Defendants have not demonstrated that the Court committed any clear error. The Court previously considered Section 143-291(e) and did not err in its interpretation of that statute.

### A. The Court Previously Considered Section 1430291(e).

As an initial matter, the Moving Defendants premise their Motion in part on the assertion that "the newly enacted amendment to the Torts Claim Act was not dealt with" in the Court's August 25, 2025 Memorandum Opinion and Order ("2025 Opinion"). Dkt. 38 at 4. The record establishes otherwise.

The Court's 2025 Opinion quoted the newly enacted amendment—subsection (e)—in full and expressly addressed the Moving Defendants' contention that its October 23 enactment precludes individual-capacity negligence claims outside the North Carolina Industrial Commission. Dkt. 33 at 16-17. Specifically, after distinguishing claims asserted against state employees in their official capacities from those asserted against employees individually, the Court explained:

> "While DPS *et al.* argue that the October 2023 enactment of subsection (e) (quoted above) also precludes individual capacity suits outside the NCIC, courts hearing cases after this enactment have not interpreted it to do so. *See Shaw v. Town of Mint Hill*, 2024 WL 2162891, at *8 (W.D.N.C. May 14, 2024) (holding that "Plaintiff may . . . bring before this Court a negligence claim against SBI Defendants in their individual capacities." (emphasis original)); *Torres v. Dye*, 2024 WL 5205570, at *13 (W.D.N.C. Dec. 23, 2024) (addressing only plaintiff's official capacity negligence claims in discussion of the TCA and later dismissing plaintiff's individual capacity claims as barred by public official immunity instead). This Court declines to deviate from this line of cases."

*Id.* at 17. The Court then concluded that, because Plaintiff sued the relevant Defendants in their individual capacities, Plaintiff's negligence claims were not precluded by sovereign immunity or

the Tort Claims Act. *Id.* The 2025 Opinion thus did not overlook subsection (e); it expressly considered and rejected the interpretation the Moving Defendants now advance.

The relevant question on reconsideration is therefore not whether subsection (e) should now be considered for the first time. It is whether the Moving Defendants have demonstrated the Court's prior construction of that provision was clearly erroneous and that permitting the ruling to stand would work a manifest injustice. They have not.

B. The Moving Defendants Have Not Established Clear Error.

The Moving Defendants contend that the 2023 amendment to the North Carolina Tort Claims Act eliminated individual-capacity negligence actions against state employees for conduct within the scope of their employment and requires dismissal of Plaintiff's state-law claims. Dkt. 38 at 5-7. They maintain that the statutory language is unambiguous and that limiting the amendment to negligence claims against the State would make the amendment redundant. *Id.* at 6-7. Their argument presents a substantial question of statutory interpretation. But reconsideration requires more than a substantial competing interpretation; it requires clear error causing manifest injustice. *Carlson*, 856 F.3d at 325; *U.S. Tobacco*, 899 F.3d at 258. Those contentions do not establish the clear error necessary to reconsider the Court's prior ruling. The statutory context, the preexisting common-law remedy, and subsequent decisions addressing the amendment support the conclusion that Defendants have not met that standard.

The General Assembly added subsection (e) to the North Carolina Tort Claims Act in 2023. The subsection provides:

> This Article provides the sole and exclusive remedy for any claim that arises as a result of the negligence of any officer, employee, involuntary servant, or agent of the State while acting within the scope of his office, employment, service, agency, or authority, and the North Carolina Industrial Commission is the sole and exclusive forum for hearing any such claims. Any such claims filed in any other forum arising out of or relating to the same

> subject matter against the officer, employee, involuntary servant, or agent of the State is precluded.

N.C. Gen. Stat. § 143-291(e). The amendment became effective October 3, 2023, and applies to all claims filed on or after that date. 2023 N.C. Sess. Laws 134, § 31.1(a)-(b). Plaintiff filed her Complaint on September 18, 2024 (Dkt. 1), so the amendment applies temporally to this action. The disputed question is whether the amendment displaced the common-law remedy against state employees sued in their individual capacities.

Before the amendment, North Carolina law distinguished that remedy from an action against the State. In *Meyer v. Walls*, the Supreme Court of North Carolina held that "the Tort Claims Act applies only to actions against state departments, institutions, and agencies and does not apply to claims against officers, employees, involuntary servants, and agents of the State." 347 N.C. 97, 107 (1997). The Supreme Court of North Carolina noted, however, that "the fact that defendants may have been acting as agents of the State does not preclude a claim against defendants." *Id.* at 108. Accordingly, the Supreme Court of North Carolina expressly recognized that a "plaintiff may maintain both" an Industrial Commission proceeding against a state agency and a common-law negligence action against the responsible employee. *Id.* The Supreme Court of North Carolina subsequently reaffirmed the underlying distinction in *Estate of Long v. Fowler*, 378 N.C. 138 (2021) and held that, "[f]ollowing our precedent, sovereign immunity does not apply to suits against state employees in their individual capacities." *Id.* at 139. Neither decision determines subsection (e)'s effect, but both establish the legal distinction the amendment allegedly displaced.

The Moving Defendants argue that subsection (e) abrogated the rule recognized in *Meyer v. Walls*, 347 N.C. 97 (1997), and that the "clear and unequivocal intent of N.C. Gen. Stat. § 143-291(e) is to preclude all other state law claims after a plaintiff has chosen to pursue a remedy under

the Tort Claims Act." Dkt. 38 at 5-7. Subsection (e), however, must be read together with the remainder of § 143-291. *See State v. Tew*, 326 N.C. 732, 739 (1990) ("All parts of the same statute dealing with the same subject are to be construed together as a whole."); *Dickson v. Rucho*, 366 N.C. 332, 342 (2013) ("We read section 120-133 in the context of the entire article in which it appears."). As Plaintiff observes, subsection (a), which remains unchanged in relevant part, continues to describe the Commission's authority in terms of "claims against the State Board of Education, the Board of Transportation, and all other departments, institutions and agencies of the State." Dkt 39 at 7; N.C. Gen. Stat. § 143-291(a). Article 31 itself also remains captioned "Tort Claims against State Departments and Agencies." N.C. Gen. Stat. § 143-291; *see Dickson*, 366 N.C. at 342-43 ("As we have noted in other cases, the title of an act may be an indication of legislative intent."); *State v. Flowers*, 318 N.C. 208, 215 (1986) (relying on the title of N.C. Gen. Stat. § 15A-136 to support the court's conclusion that the statute addresses a matter of venue). Subsection (e), in turn, identifies "[t]his Article" as the exclusive remedy and repeatedly refers to "any such claims." N.C. Gen. Stat. § 143-291(e). Those references support construing the exclusivity provision as governing claims within the Act's existing remedial framework.

To be sure, subsection (e) expressly refers to claims against employees. *Id.* But the employee-specific language must still be considered in light of the provision's references to Article 31 and "such claims," *id.*, as well as the established distinction between the statutory remedy against the State and the common-law remedy against the employee personally. The Court's prior construction preserves that distinction; the Moving Defendants' construction eliminates it. The Court also notes that the heading accompanying the amendment does not resolve its scope. Although § 31.1 is headed "LIMIT TORT LIABILITY FOR STATE EMPLOYEES," the same enactment expressly provides "[t]he headings to the Parts, Subparts, and sections of this act are a

convenience to the reader and are for reference only. The headings do not expand, limit, or define the text of this act." 2023 N.C. Sess. Laws 134, § 43.6. The amendment's heading therefore cannot independently establish the displacement Defendants assert.

North Carolina's treatment of common-law remedies also supports caution before adopting the latter reading. Section 4-1 of the North Carolina Code preserves the common law unless, among other things, it has been otherwise provided for, abrogated, or repealed. *See* N.C. Gen. Stat. § 4-1. Although displacement may occur without particular terminology, the Supreme Court of North Carolina explained in *Price v. Edwards*, 101 S.E. 33 (1919), that it must appear from the statute's express language or plain implication, and "statutes in derogation of common law, or common right, are construed strictly." *Id.* at 36. Moreover, "it is always presumed that the Legislature acted with full knowledge of prior and existing law." *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 695 (1977). "Necessarily, this presumption must include the common law." *Dickson*, 366 N.C. at 342. Further, "the General Assembly repeatedly has demonstrated that it knows how to be explicit when it intends to repeal or amend the common law." *Id.*; *see, e.g.*, N.C. Gen. Stat. § 48A-1 (2011) ("The common-law definition of minor insofar as it pertains to the age of the minor is hereby repealed and abrogated."); *id.* § 50–6 (2011) (similar); *id.* § 160A-626(b) (2011) (similar); *see also id.* § 36C-8-816.1(g) (2011) (recognizing that the phrase "provision of law" does not refer to the common law by stating: "Nothing in this section shall be construed to abridge the right of any trustee who has a power to appoint property in further trust that arises under the terms of the original trust or under any other section of this Chapter or under another provision of law or under common law."). By the time subsection (e) was enacted in 2023, *Meyer* had recognized the availability of parallel proceedings against the State and its employees for twenty-six years. That longstanding rule forms part of the legal background against which the

amendment also must be read. Although legislative awareness does not itself establish that the rule survived, it counsels against inferring its displacement without sufficiently clear statutory direction. The Moving Defendants' assertion that the amendment "negated" *Meyer* does not, without more, establish that the Court's construction was clearly erroneous.

The Moving Defendants' argument that the Court's construction renders Section (e) redundant is not persuasive. The Moving Defendants argue that reading subsection (e) "as only restricting negligence claims against the state from being filed outside of the Industrial Commission would render subsection (e) redundant to preexisting law and without meaning." Dkt 38 at 7. But the Court's construction does not render this provision without force; rather, the express prohibition emphasizes that *official capacity* claims must be brought before the Industrial Commission. And, it is important not to overread the impact of such a section, especially where the statute does not explicitly announce an intention to overrule the common law.

The Moving Defendants separately challenge the authorities supporting the 2025 Order. *Id.* at 4-5. Their Memorandum in Support identifies *Shaw v. Town of Mint Hill* and *Southeastern Public Safety Group v. Munn* as cases on which the Court relied and emphasizes that those actions preceded the amendment's effective date. *Id.* The Moving Defendants are correct that decisions involving earlier-filed claims do not resolve the amendment's application here. That limitation warrants acknowledgment, but it does not itself establish that the ruling itself was clearly erroneous. The statutory considerations discussed above remain and provide a basis for the Court's construction independent of those decisions.

Subsequent federal decisions provide additional support for the Court's disposition. In March of 2026, in the Middle District of North Carolina, the defendants in *Forero v. University of North Carolina at Chapel Hill Police Department, et al.* expressly argued that § 143-291(e)

required dismissal of a negligent-infliction-of-emotional-distress claim against state employees sued in their individual capacities because the Industrial Commission provided the exclusive forum. *See* No. 1:24-cv-930, Dkt 31 at 64 n.19 (M.D.N.C. Mar. 13, 2026) (Auld, M.J.), *recommendation adopted*, 2026 WL 891991, at *1 (M.D.N.C. Mar. 31, 2026) (Shroeder, D.J.). The magistrate judge rejected that argument, stating "[t]hat contention lacks merit. As the North Carolina Supreme Court has repeatedly held, 'the fact that [North Carolina's] Tort Claims Act provides for subject matter jurisdiction in the Industrial Commission over a negligence claim against the State does not preclude a claim against [individual] defendants in [a c]ourt.'" *Id.* (citations omitted). The district court thereafter considered the defendants' objection based specifically on the 2023 amendment and, following *de novo* review, likewise declined to dismiss the claim. 2026 WL 891991, at *1 (M.D.N.C. Mar. 31, 2026). The district court emphasized the "lack of authority cited by Defendants," noting they "point[ed] this court to no caselaw indicating that the amendment in question has deprived this court of jurisdiction over [plaintiff]'s claim. Most courts have concluded, to the contrary, that the statute does not preclude individual capacity negligence claims in federal court." *Id.* (internal citation omitted).

Shortly thereafter, in *Campbell v. University of North Carolina at Greensboro, et al.*, another magistrate judge in the Middle District of North Carolina likewise concluded that subsection (e) did not bar claims against employees sued individually, although the recommendation proposed dismissal on other grounds. *See* 2026 WL 1453776, at *19 n.18 (M.D.N.C. May 22, 2026) (McFadden, M.J.), *recommendation adopted*, 2026 WL 2936495, at *1 (M.D.N.C. Sept. 30, 2026). The magistrate judge there noted that "[n]ot only do [defendants] fail to cite any case law supporting their position, but this court recently addressed a similar argument and recognized that '[m]ost courts have concluded, to the contrary, that the statute does not

preclude individual capacity negligence claims in federal court.'" *Id.* (quoting *Forero*, 2026 WL 891991, at *1) (internal citation omitted). The magistrate judge's recommendation was adopted, though the district court's Order did not separately address subsection (e).

Also in March of 2026, in *Neal v. Carter*, the Eastern District of North Carolina declined, at the preliminary stage, to dismiss individual-capacity negligence claims under subsection (e), observing that "[m]ost district courts that have addressed the issue have determined that subsection (e) does not preclude individual capacity negligence claims in federal court." 2026 WL 820852, at *4-5 & n.4 (E.D.N.C. Mar. 25, 2026) (citing *Carias v. N.C. Dep't of Pub. Safety*, 2025 WL 2404530, at *8 (M.D.N.C. Aug. 19, 2025)); *see id.* ("Plaintiff provides no case law holding that subsection (e) precludes negligence claims brought in federal court against state officials in their individual capacities."). Most recently, in September of 2026, the Western District of North Carolina recognized in *Shine v. Varney* that "there is some question whether individual capacity negligence claims against prison officials must now be brought before the North Carolina Industrial Commission" and "decline[d] at this stage of the proceedings to dismiss Plaintiff's negligence claims on this ground." 2026 WL 2719127, at *10 (W.D.N.C Sept. 15, 2026). Thus, judges in each of North Carolina's three federal districts that have confronted the amendment have declined to hold that it requires dismissal of individual-capacity negligence claims.[3] That

[3] The Court has also considered the contrary June 2026 order in *Locke, et al., v. Woodson, et al.*, where a Wake County superior court in North Carolina applied subsection (e) to dismiss claims against individually named university officials. No. 25-cv-032781-910, Order Granting Motions to Dismiss of Defendants Yow, Corrigan, Lipitz, Menio, Lee, Clinkscales, and Harrison, at 1-2 (N.C. Super. Ct., Wake County, filed June 9, 2026), notice of appeal filed June 24, 2026. The court found that "N.C. Gen. Stat. § 143-291(e), by its plain language, gives exclusive jurisdiction over all claims concerning these Defendants to the North Carolina Industrial Commission. The Court further finds that Plaintiffs have failed to demonstrate beyond a reasonable doubt that Section 143-291(e) is unconstitutional as applied to this case." Although the *Locke* decision certainly warrants consideration, it does not compel a different result. The court's analysis in that case begins and ends with those two assertions, and the court did not address

consistent treatment provides additional support for the conclusion that the Court's interpretation, even if debatable, is not clearly erroneous. Accordingly, the Moving Defendants have not demonstrated clear error.

C. The Moving Defendants Have Not Shown Manifest Injustice.

The Moving Defendants' two-sentence manifest-injustice argument depends on the same premise as their clear-error argument. They assert that requiring them to litigate claims over which the Industrial Commission possesses exclusive jurisdiction would itself constitute manifest injustice. Dkt. 38 at 7. But that contention assumes the very statutory interpretation the Court previously rejected and that the Moving Defendants have not shown to be clearly erroneous. Because they have not established that § 143-291(e) precludes Plaintiff's individual-capacity negligence claims in this Court, they likewise have not established that continued litigation of those claims produces a manifest injustice warranting reconsideration.

IV. CONCLUSION

Rule 54(b) permits this Court to correct a prior ruling when warranted; it does not provide a vehicle for repeatedly relitigating a legal issue merely because a party continues to disagree with the Court's resolution of it. *See Carlson*, 856 F.3d at 325-26. The Moving Defendants have not satisfied the standard for reconsideration.

For the foregoing reasons, it is hereby ORDERED that Defendants Martha Turner, Psy.M.A., and Henry Brandhorst, Psy.D.'s Motion for Reconsideration (Dkt. 37) is DENIED.

IT IS SO ORDERED.

October 5, 2026
Alexandria, Virginia

/s/
Rossie D. Alston, Jr.
United States District Judge

---

the relationship between subsections (a) and (e) or the common-law distinction discussed above. Accordingly, this decision does not demonstrate clear error.